Filed 12/30/20  Block v. Raines Feldman LLP CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN


| | |
|---|---|
| WILLIAM H. BLOCK, <br><br> Plaintiff and Appellant, <br><br> v. <br><br> RAINES FELDMAN LLP et al., <br><br> Defendants and Appellants. | B297871 <br><br> (Los Angeles County Super. Ct. No. SC125895) |


APPEALS from a judgment of the Superior Court of Los Angeles County, Mark A. Young, Judge.  Reversed with directions.

Lavely & Singer, Martin D. Singer and Paul N. Sorrell for Plaintiff and Appellant.

Robie & Matthai, Edith R. Matthai and T. John Fitzgibbons for Defendant and Appellant Raines Feldman LLP.

Tantalo & Adler, Joel M. Tantalo and Michael S. Adler for Defendant and Appellant Noel C. Lohr.

_____

**INTRODUCTION**

William H. Block appeals from the judgment in this legal malpractice action following the trial court's orders granting motions by the law firm Raines Feldman LLP, attorney Noel Lohr, and Lohr's company LHR Enterprises, LLC, for summary judgment and denying a motion by Block for leave to amend his complaint.  Block alleged Raines Feldman, Lohr, and LHR Enterprises breached their duties of loyalty and care to him by representing him notwithstanding a conflict of interest created by simultaneously representing Block's employer, QED Holdings, LLC (QED), negotiating deals for Block that increased his liability to QED, and failing to close and finalize a separation agreement between Block and QED (although Block subsequently abandoned this last claim).  Block also alleged that the defendants breached an oral contract, that LHR Enterprises breached a written contract, and that Lohr (as of counsel with Raines Feldman) improperly refused to cooperate with Block in an arbitration proceeding QED commenced against him.

Raines Feldman and Lohr moved separately for summary judgment on the grounds that the statute of limitations governing legal malpractice actions barred Block's complaint, that Block's alleged damages were not caused by the defendants' alleged professional negligence and were speculative, and that the defendants could not defend themselves in the action without

2

disclosing attorney-client privileged information.[1]  The trial court granted both motions, ruling that the statute of limitations barred portions of Block's action and that the remaining portions alleged only speculative damages.  The court rejected the argument by Raines Feldman and Lohr that the court had to dismiss the case because they could not defend themselves without disclosing privileged information.  The court denied Block's motion for leave to amend the complaint, ruling that Block inexcusably delayed in seeking leave to amend until after Raines Feldman and Lohr filed their motions for summary judgment and that Block did not show the proposed causes of action were based on newly discovered facts.  Block appealed the trial court's adverse rulings, and Raines Feldman and Lohr protectively cross-appealed from the portion of the trial court's order declining to grant summary judgment on the ground they could not defend themselves without disclosing attorney-client privileged information.

We agree with the trial court that Block's alleged damages arising from Lohr's refusal to cooperate with Block or testify in the arbitration are speculative as a matter of law, but that Block's alleged damages arising from Raines Feldman's and Lohr's breaches of fiduciary duty and negligence are not.

---

[1]  Lohr joined Raines Feldman's motion and filed a separate motion.  LHR Enterprises did not file a motion for summary judgment or join in Raines Feldman's or Lohr's motion.  Raines Feldman and Lohr assert Block voluntarily dismissed LHR Enterprises after the trial court granted the motions for summary judgment, although there is nothing in the record to corroborate their assertion.  Block states only that the parties "stipulated to deal with claims against [LHR Enterprises] depending upon the results of this appeal."

3

Because at oral argument Block abandoned certain theories of liability, however, his potential damages from the claims that remain are significantly curtailed. We also conclude the trial court erred in granting summary judgment on the statute of limitations defense because Block submitted evidence that created triable issues of material fact on whether the statute of limitations was tolled while Raines Feldman and Lohr continued to represent Block. And we agree with the trial court that Raines Feldman and Lohr did not demonstrate they could not defend themselves without revealing attorney-client privileged information. Therefore, we reverse the orders granting the motions for summary judgment and the order denying Block leave to amend.

## FACTUAL AND PROCEDURAL BACKGROUND

A.  *Lohr Represents Block in Connection with Film Projects and His Separation from QED*

Block created and controls several companies that produce entertainment content, including DG Licensing, LLC and Block Entertainment, LLC. In 2006 Block created QED International, LLC, and in 2012 sold that company to Media Content Capital, LP. The successor to QED International, QED Holdings, LLC (QED), retained Block as its Chief Executive Officer. Media Content Capital is the majority shareholder of QED. According to Lohr, she represented QED in film finance matters through LHR Enterprises beginning in November 2012.

On September 30, 2013 Block, on behalf of DG Licensing, and Lohr, on behalf of LHR Enterprises, executed a consulting services agreement. The agreement stated LHR Enterprises would "furnish the consulting services of [Lohr]" in connection

4

with production loans, distribution agreements, and "such other matters as may be requested [by DG Licensing]" for the motion picture *Dirty Grandpa*. The parties acknowledged "the services to be rendered include services of a business nature, although they may include rendering certain legal services or legal advice." Two weeks later, in October 2013, Lohr joined Raines Feldman as of counsel with the firm. The agreement between Lohr and Raines Feldman stated a partner of the firm would supervise Lohr's work.

In 2014 Block began negotiating his separation from QED. On July 10, 2014 Block sent Lohr an email summarizing several key negotiating points he had exchanged with Joshua Grode, an attorney at Irell & Manella LLP, who represented QED and Media Content Capital. Block stated in his email to Lohr: "Noel—This is a brief summation of my new deal with QED. [I] [w]ould like you to prepare a draft for [counsel for QED]." Lohr responded by sending an email the next day stating: "I've spent some time looking at the original deal documents for the investment and your employment agreement and I have some questions and thoughts as we look to document the new arrangement. I'd like the opportunity to talk these through with you." Block alleges this email exchange created an attorney-client relationship between him and Lohr as of counsel to Raines Feldman.[2] The managing director of Media Content Capital, Sasha Shapiro, also understood Lohr represented Block in his negotiations with QED.

---

[2] Block alleged he retained Lohr to represent him in his separation from QED in May 2014, but this email exchange occurred in July 2014.

5

B.    *Block and QED Negotiate Block's Separation Agreement*

Negotiations on Block's separation from QED continued through the end of 2014.  Meanwhile, Block pursued *Dirty Grandpa* and other projects on which both Lohr and another Raines Feldman attorney, Josh Mogin, provided advice.

On December 19, 2014 Shapiro sent Block the proposed terms for Block's separation from QED, which Shapiro called the "framework for the settlement and separation agreement" between QED and Block (and which Block shortens to the "framework agreement" and Raines Feldman refers to as the "deal points").  The proposed agreement listed 10 terms, including a January 31, 2015 date for the termination of Block's employment with QED; formulas for the division of proceeds, agency fees, producer fees, and the "back end ('points')" from various film projects, including *Dirty Grandpa*; methodologies for financing and allocating certain market expenses; a mutual release; an indemnification by Block; a $150,000 payment by Block for expenses QED had advanced him; and an office sublease for Block.  After clarifying a point regarding the division of proceeds, Block sent an email to Shapiro, copied to Lohr, stating, "Unless Noel has a question, I am confirmed.  Noel?"  On December 21, 2014 Lohr responded that "[t]he clarification work[ed] for [her] as well."  Block stated that he directed Lohr "to immediately close the deal."  Shapiro sent Block an email suggesting Lohr draft "the long-form document for us."

On December 20, 2014 Block sent Lohr an email stating Shapiro told him that he (Shapiro) wanted Lohr to represent Media Content Capital "for the administration of QED."  Block told Lohr he was "fine with that" and would "recus[e]" Lohr from representing him "once my deal is closed."  Lohr replied by thanking Block for his help in getting her work from Media

6

Content Capital and QED. She also said she would prepare an engagement letter for that work "going forward after the settlement that clarifies that [she] can represent [Block] and Block Entertainment on other things" not adverse to Media Content Capital or QED.

QED retained Raines Feldman to draft the long-form separation agreement. A January 12, 2015 conflict waiver letter from Lohr on Raines Feldman letterhead sought written consent from QED, Block, and Block Entertainment for Raines Feldman to represent QED "in connection with its general corporate, entertainment and employment matters and related legal issues, and particularly with respect to the documentation and review of the separation and settlement with Block." The letter stated that Raines Feldman "previously represented [QED] in unrelated matters" and "currently represents [QED]" and that Lohr, "who is of counsel to [Raines Feldman] also represents Block, [Block Entertainment] and other Block related entities and also represents [QED] in unrelated matters in her capacity outside of [Raines Feldman]." The letter defined the "Parties" as QED, Media Content Capital, and Block. By signing the letter, the Parties consented to Raines Feldman's representation of QED "even though there may be future actual conflicts between the Parties." Though Lohr was not a "Party," the letter stated Lohr "agrees by signing [the] letter on behalf of [Raines Feldman], that she will not represent Block or [Block Entertainment] in connection with any matter in which Block or [Block Entertainment] is adverse to [QED]." Block signed the letter "based on the assumption and agreement that [Raines Feldman and Lohr] would not represent [QED] until Block's exit deal with [QED] was closed."

Long before Block signed the conflict waiver letter and just a day before Block (through Lohr) confirmed the terms of the

7

framework agreement, however, Lohr sent an email to Shapiro (without sending a copy to Block) raising questions about the framework agreement's general release, indemnity, and division of proceeds from unproduced film projects owned by QED as of the date of termination of Block's employment that Block subsequently produced, including a film called *Birth of a Dragon*. The draft long-form agreement Lohr eventually sent Block and Shapiro on January 26, 2015 deviated from the framework agreement reached in December 2014 by, among other things, including carve-outs from the mutual release that favored QED and by giving QED rights in subsequent productions related to *Dirty Grandpa* that were not included in the framework agreement.

On January 31, 2015 Block sent an email to Tim Connors, an attorney affiliated with QED, asking to "engage" him "to help finish" the separation agreement. About two weeks later Connors sent Block an email identifying the "two open issues [as] the 50% share of [*Dirty Grandpa*] sequels and the nonreciprocal release." According to Raines Feldman, negotiations on Block's separation agreement fell apart shortly thereafter because "QED discovered liabilities that Block had created for QED without obtaining necessary approvals or disclosing them to QED."

      C.    *Block Retains Lavely & Singer, and QED Commences an Arbitration and a Federal Action Against Block*

Block retained the law firm of Lavely & Singer in February 2015 to represent him in connection with his separation from QED. On March 18, 2015 QED commenced an arbitration

against Block.[3]  The arbitration demand alleged Block and Block-owned entities usurped QED's rights in *Dirty Grandpa* and *Birth of a Dragon* by entering into agreements with third parties without QED's consent and by transferring certain rights from QED to Block-owned entities.  QED also sued Block in federal district court on April 1, 2015.  On April 2, 2015 Block filed a Statement of Counterclaims and Cross-claims in the arbitration.

> D.   *Lohr Continues To Provide Legal Services to Block, but Refuses To Cooperate with Him in the Arbitration*

Lohr continued to represent Block or Block Entertainment on matters related to *Dirty Grandpa* and other projects until October 2015.  For example, in June 2015 Lohr helped Block negotiate a collection account management agreement (known in the industry as a CAMA) for *Dirty Grandpa* that is referred to in a draft of the long-form agreement that was supposed to formalize the framework agreement.  Also in June 2015 LHR Enterprises sent an invoice to DG Licensing for "[s]ervices provided in connection with *Dirty Grandpa*," including work on a distribution deal with Lionsgate, "chain-of-title follow-up," "tax purchase documents and issues," and "overbudget issues."  In August 2015 Block sent Lohr an email asking her to address the sales fee for Creative Artists Agency stemming from the Lionsgate deal.  Lohr responded that she "will calendar."  In October 2015 Block and Lohr exchanged emails about an Eastern European distribution agreement for *Dirty Grandpa,* including a term sheet for the deal.

---

[3]   QED supplemented its arbitration demand on July 21, 2015, but the record on appeal includes only the demand filed in March 2015.

Block also sought Lohr's cooperation in the arbitration with QED to prove the December 2014 framework agreement was enforceable. Through Raines Feldman, however, Lohr refused to meet with counsel for Block and took the position she had never represented Block in his separation from QED. On October 15, 2015 Block served a subpoena for Lohr's appearance at the arbitration hearing. Raines Feldman, as Lohr's attorneys, objected to the subpoena, essentially taking the position she either represented all of the parties or was not sure which parties she represented and needed the arbitrator to determine that for her. Lohr's objection stated (contrary to the position Raines Feldman had taken previously): "[S]ince [Lohr] acted as the attorney for the parties, testimony by her would raise attorney client privilege issues. Before she could testify at all, a determination or ruling would have to be made regarding which party or parties she represented, and during what time period. Without such a ruling, any testimony by her would potentially violate the attorney client privilege of one or the other of the parties." Raines Feldman subsequently wrote to counsel for Block on behalf of Lohr and stated that Lohr "did NOT serve as Mr. Block's attorney" in connection with Block's separation from QED. Lohr also requested a hearing for the arbitrator to rule on her objections. On October 21, 2015 Block sent Lohr an email terminating the services of her "law firm."

E.    *Block and QED Settle Their Dispute*

On November 2, 2015 Block and QED entered into a settlement agreement. The agreement provided for the division of proceeds from *Dirty Grandpa* and its sales fee, addressed certain costs and expenses for *Dirty Grandpa* as well as the collection account management agreement for *Dirty Grandpa*, and required Block to pay QED $1.5 million from Block's share of

10

back-end and sales fees. The settlement agreement also addressed production credits for *Dirty Grandpa* and included releases by Block and QED and an indemnification by Block.

F. *Block Files This Action, Raines Feldman and Lohr Move for Summary Judgment, and Block Asks for Leave To Amend the Complaint*

On May 23, 2016 Block filed this action against Raines Feldman, Lohr, and LHR Enterprises. Block alleged causes of action against all defendants for breach of fiduciary duty, negligence, breach of oral contract, and against LHR Enterprises for breach of a written contract. In his causes of action for breach of fiduciary duty and negligence, Block alleged the defendants "(a) represent[ed] Block notwithstanding a clear conflict of interest emanating from their representation of [QED], (b) negotiat[ed] new deals for Block outside [QED] that [QED] contended were in violation of Block's obligations under [a 2012 contribution agreement] and his Employment Agreement, (c) fail[ed] to close the settlement reached between Block and [QED] on December 19-21, 2014, as referenced in emails exchanged between Block and [QED], and instead creat[ed] open issues and uncertainties that led to subsequent, costly litigation between the parties, (d) fail[ed] to discharge their duties and obligations to Block in connection with the negotiation and documentation of his separation and settlement agreement with [QED] because of their conflicts of interest, (e) fail[ed] and refus[ed] to reasonably cooperate with Block in connection with his arbitration hearing in the dispute between Block and [QED], including by failing to meet with Block and his counsel, and refus[ed] to testify at the arbitration hearing despite the fact that Lohr was a key witness and had been subpoenaed for the hearing, and (f) refus[ed] to acknowledge Defendants' previous

11

representation of Block, and [took] the position that Lohr had not represented Block . . . ."  Block alleged that, as a result, he incurred "costly litigation," "was forced to settle with QED . . . on a less favorable basis," and suffered monetary damages in excess of $3 million.

In November 2018 Raines Feldman and Lohr filed motions for summary judgment.  They argued they were entitled to judgment as matter of law because (1) the one-year statute of limitations under Code of Civil Procedure section 340.6 barred the action,[4] (2) Block could not establish causation because QED would not have agreed to terms more favorable to Block, and (3) the evidence necessary to disprove Block's allegations was subject to the attorney-client privilege.

Two months after Raines Feldman and Lohr filed their motions for summary judgment, Block deposed Lohr.  According to Block, Lohr testified she "knowingly lied" about representing Block personally in the conflict waiver letter.  Based on that testimony, Block filed a motion for leave to amend his complaint. Block proposed to add causes of action for intentional misrepresentation, declaratory relief, and rescission, as well as allegations to support the new causes of action.

> G. *The Trial Court Grants the Motions for Summary Judgment and Denies the Motion for Leave To Amend the Complaint*

The trial court granted Raines Feldman's and Lohr's motions for summary judgment.  The court ruled the statute of limitations barred Block's action to the extent it was based on "the failure of the deal and the subsequent arbitration" because the allegedly actionable conduct occurred in February and March

---

[4]    Statutory references are to the Code of Civil Procedure.

2015, respectively, and Block did not file this action until May 2016. The court rejected Block's argument that Lohr's continued representation of Block on matters related to his separation from QED tolled the statute of limitations for conduct occurring in February and March 2015.

With respect to Lohr's refusal to cooperate with the arbitration in October 2015 (which occurred within a year of Block's filing of this action), the trial court ruled that Lohr did not breach her fiduciary duties to Block by objecting to Block's subpoena and refusing to testify at the arbitration. The trial court ruled in the alternative that any damages from the alleged breach were speculative. Although the court had already concluded that the alleged breaches of duty based on the defendants' failure to close the 2014 framework agreement were time-barred, the trial court found the alleged damages caused by that conduct were not speculative. The court stated the "evidence suggesting the presence of a 'framework' with terms more favorable to [Block] than the ultimate agreement that was reached creates a non-speculative question of fact as to a potential better deal that was defeated by Defendant's [*sic*] alleged conduct."

Finally, the court rejected Raines Feldman and Lohr's argument that the court had to dismiss Block's complaint because their defense required them to disclose attorney-client privileged communications. The court concluded that the communications the defendants claimed were privileged were not "highly material" or necessary to their defense and that they did not show it would be fundamentally unfair to allow Block's action to proceed.

The trial court denied Block's motion for leave to amend the complaint, ruling the proposed new causes of action were based on evidence available to Block at the time he filed the original

13

complaint. In particular, the court found that Block knew when he filed the original complaint Lohr had taken the position she did not represent Block personally and that Block "even reference[d] [Lohr's] belief in the complaint." The court also concluded that allowing Block to amend the complaint would prejudice the defendants because they had already filed motions for summary judgment. Thus, the court ruled, the motion for leave to amend presented "a 'moving target'" for summary judgment.

Block timely appealed.[5] Raines Feldman and Lohr filed notices of cross-appeal from the portion of the trial court's order denying their motions for summary judgment on the ground the attorney-client privilege prevented them from defending against Block's complaint.

### H. *At Oral Argument in This Court, Block Abandons Some but Not All of His Claims*

During questioning at oral argument in this court about the bases for Block's causes of action, counsel for Block stated that, contrary to the allegations in the complaint, Block was not

---

[5] On May 16, 2019 Block filed a notice of appeal purporting to appeal from a judgment after an order granting the defendants' motions for summary judgment and an order denying his motion for leave to amend the complaint. The trial court, however, did not enter judgment until June 3, 2019. Orders granting summary judgment or denying leave to amend are not appealable, but in the interests of justice and efficiency, we construe Block's notice of appeal as filed immediately after entry of judgment. (See *H.N. & Frances C. Berger Foundation v. City of Escondido* (2005) 127 Cal.App.4th 1, 6-7, fn. 5; Cal. Rules of Court, rule 8.104(d)(2).)

claiming Raines Feldman or Lohr committed malpractice by failing to adequately document and close the framework agreement concerning Block's separation from QED. Counsel for Block said that Block "can't force Ms. Lohr to make a party sign the agreement." Instead, counsel for Block argued that Raines Feldman and Lohr breached their duties to Block beginning in early 2015, after Block and QED had agreed to a broad release in the framework agreement, by representing Block in a manner contrary to his interests and creating future liabilities for him. For example, counsel for Block stated that Lohr proposed modifications to the general release in the framework agreement that increased Block's liability. As a result of counsel for Block's concessions at oral argument, Block has abandoned the third and fourth bases for his causes of action for breach of fiduciary duty and negligence (claims (c) and (d) above) to the extent they arise from the defendants' alleged failure to adequately document the framework agreement and finalize the agreement in a long-form contract.

## DISCUSSION

A.   *Summary Judgment Principles and the Standard of Review*

A court may grant a motion for summary judgment when "all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (§ 437c, subd. (c); see *Regents of University of California v. Superior Court* (2018) 4 Cal.5th 607, 618.) "When a defendant moves for summary judgment in a situation in which the plaintiff at trial would have the burden of proof by a preponderance of the evidence, the defendant may, but

15

need not, present evidence that conclusively negates an element of the plaintiff's cause of action.  Alternatively, the defendant may present evidence to "'show[ ] that one or more elements of the cause of action . . . cannot be established" by the plaintiff.'" (*Mattei v. Corporate Management Solutions, Inc.* (2020) 52 Cal.App.5th 116, 122; see § 437c, subd. (p)(2); *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 853.)  The moving party has the burden to show that the plaintiff has not established, and cannot reasonably expect to establish, the elements of his or her cause of action.  (*Mattei*, at p. 122; see *Ennabe v. Manosa* (2014) 58 Cal.4th 697, 705.)

"'A defendant has the initial burden to show that undisputed facts support summary judgment based on the application of an affirmative defense.'" (*Drexler v. Petersen* (2016) 4 Cal.App.5th 1181, 1188.)  "A defendant moving for summary judgment based on the affirmative defense of the statute of limitations carries its burden by presenting evidence establishing that the plaintiff's claim is time barred." (*Genisman v. Carley* (2018) 29 Cal.App.5th 45, 49; see *The Police Retirement System of St. Louis v. Page* (2018) 22 Cal.App.5th 336, 340.)  "'It then falls to plaintiff[ ] to counter with evidence creating a dispute about a fact relevant to that defense.' [Citation.]  That is, the plaintiff must submit evidence that would allow a 'reasonable trier of fact [to] find in plaintiff['s] favor on the statute of limitations issue.'" (*Genisman*, at p. 49; see *Aguilar v. Atlantic Richfield Co.*, *supra*, 25 Cal.4th at pp. 850-851.)  If a defendant presents evidence establishing an action was time-barred, and the plaintiff did not effectively dispute any of the relevant facts, the court properly granted summary judgment. (*Genisman*, at p. 49; see § 437c, subd. (p)(2).)

16

"We review a grant of summary judgment de novo and decide independently whether the facts not subject to triable dispute warrant judgment for the moving party as a matter of law." (*Mattei v. Corporate Management Solutions, Inc.*, *supra*, 52 Cal.App.5th at p. 122; see *Hampton v. County of San Diego* (2015) 62 Cal.4th 340, 347.)  "The reviewing court 'liberally constru[es] the evidence in favor of the party opposing the motion and resolv[es] all doubts about the evidence in favor of the opponent.' [Citation.]  Similarly, 'any doubts as to the propriety of granting a summary judgment motion should be resolved in favor of the party opposing the motion.'" (*Ghazarian v. Magellan Health, Inc.* (2020) 53 Cal.App.5th 171, 182; see *Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 535.)

B.  *Raines Feldman and Lohr Did Not Demonstrate That All of Block's Damages Claims Were Speculative*

In determining whether certain types of injuries Block alleged were caused by Raines Feldman's and Lohr's alleged negligence, the trial court concluded some damages were speculative while others were not.  As a result, both sides challenge the trial court's rulings on causation and damages.

1.  *Applicable Law*

To prevail on a legal malpractice claim, a plaintiff must prove "'a proximate causal connection between the breach and the resulting injury'" and "'actual loss or damage resulting from the attorney's negligence.'" (*Namikas v. Miller* (2014) 225 Cal.App.4th 1574, 1581.)  "'In the legal malpractice context, the elements of causation and damage are particularly closely linked.' [Citation.]  The plaintiff must prove, by a preponderance of the evidence, that but for the attorney's negligent acts or

17

omissions, he would have obtained a more favorable judgment or settlement in the action in which the malpractice allegedly occurred.  [Citations.]  This standard requires a 'trial-within-a-trial' of the underlying case, in which the malpractice jury must decide what a reasonable jury or court would have done if the underlying matter had been tried instead of settled.  [Citation.]  This method "'is the most effective safeguard yet devised against speculative and conjectural claims. . . .  It is a standard of proof designed to limit damages to those actually *caused* by a professional's malfeasance.'"" (*Id.* at p. 1582; see *Viner v. Sweet* (2003) 30 Cal.4th 1232, 1241 [requiring the plaintiff to "establish that *but for* the alleged negligence of the defendant attorney, the plaintiff would have obtained a more favorable judgment or settlement" serves "the essential purpose of ensuring that damages awarded for the attorney's malpractice actually have been caused by the malpractice"].)

"Because causation is a question of fact for the jury, it ordinarily cannot be resolved on summary judgment.  [Citation.]  In legal malpractice claims, the absence of causation may be decided on summary judgment 'only if, under undisputed facts, there is no room for a reasonable difference of opinion.'" (*Namikas v. Miller*, *supra*, 225 Cal.App.4th at p. 1583.)

> 2. *Block's Damages Caused by Lohr's Refusal To Cooperate in the Arbitration Are Speculative as a Matter of Law*

The trial court found Block's claim based on Lohr's refusal to testify at the arbitration lacked merit as a matter of law because Block "provided nothing more than speculation to indicate that he would have obtained a better arbitration result had [Lohr] testified."  The trial court explained that Block's

18

allegations invited speculation about whether the arbitrator would overrule Lohr's objections to Block's subpoena, whether Block would have prevailed at arbitration had Lohr testified, and whether Block still would have settled the dispute if Lohr had agreed to testify. As Raines Feldman and Lohr argue, these multiple layers of uncertainty support the trial court's ruling that "it would be entirely speculative to conclude that [Block] would have received a better result" had Lohr testified in the arbitration proceeding.

Block argues the damages caused by Lohr's refusal to testify in the arbitration are not speculative as a matter of law for several reasons. First, Block argues the trial court failed to consider evidence showing Raines Feldman refused to allow Lohr to testify, which made her a hostile witness that "no litigator would want to compel" to testify. This evidence does not diminish the mental gymnastics required to conclude Block would have achieved a better result in the arbitration had Lohr testified. Second, Block argues the trial court ignored evidence Lohr also failed to cooperate with Block in preparing for the arbitration. But Block does not explain how Lohr's unspecified cooperation would have bolstered his position in the arbitration or how her noncooperation made his damages any less speculative. Third, Block argues the trial court ignored evidence Lohr falsely testified in a deposition she had never represented Block in connection with the separation agreement. Again, whether Lohr testified truthfully did not make it any easier to resolve the speculation inherent in determining whether, but for Lohr's transgressions, she would have testified, would have testified truthfully about her representation of Block, and would have helped Block obtain a more favorable arbitration decision or settlement.

19

3. *Raines Feldman and Lohr Did Not Demonstrate Block's Damages Caused by Lohr's Representation After December 2014 Are Speculative as a Matter of Law*

Although the trial court ruled Block's action based on Raines Feldman's and Lohr's representation of Block prior to March 2015 was time-barred, the court nevertheless found the damages their alleged breaches of duty caused were not speculative. The trial court stated that Block's "evidence suggesting the presence of a 'framework' with terms more favorable to [him] than the ultimate agreement . . . create[d] a non-speculative question of fact as to a potential better deal that was defeated by [Raines Feldman and Lohr's] conduct."

As discussed, however, Block has now abandoned his claims Raines Feldman and Lohr committed malpractice by failing to obtain a better deal for Block (i.e., part of claim labeled (c) and all of claim labeled (d) in the complaint). And his claims related to Lohr's refusal to cooperate with the arbitration and acknowledge her representation of Block (claims labeled (e) and (f) in the complaint) are speculative. At oral argument counsel for Block did not abandon Block's claim that Raines Feldman and Lohr "creat[ed] open issues and uncertainties that led to subsequent, costly litigation between the parties" (the other part of the claim labeled (c)). But counsel for Block argued Lohr created those uncertainties by "modify[ing] the language in a release that had already been agreed to [in the framework agreement]." Without holding Raines Feldman and Lohr responsible for failing to finalize the long-form agreement with a broad release, Block cannot prove this conduct caused him any damages. Moreover, if the framework agreement's broad release is enforceable, then Lohr's attempts to "modify" the release are

20

not relevant to (or are at best extremely remote and speculative causes of) Block's damages.

Block's remaining claims are that after December 2014 Lohr (through Raines Feldman) represented him "notwithstanding a clear conflict of interest emanating from [her] representation of [QED]" and "negotiat[ed] new deals for Block outside [QED] that [QED] contended were in violation of Block's obligations" (claims labeled (a) and (b) in the complaint). In the absence of Block's (abandoned) claims arising from the failure of the framework agreement, these two remaining claims essentially collapse into one based on Lohr's representation of Block in connection with deals that allegedly increased his liability to QED and caused him to incur additional attorneys' fees, because Block has not identified any other conduct that resulted in nonspeculative damages. Under this theory, Block's damages are not the difference between the 2014 framework agreement and the November 2015 settlement agreement. Instead, the measure of Block's damages is the additional liability and attorneys' fees created by Lohr's representation of Block after December 2014 when Lohr represented both Block and QED. Raines Feldman (joined by Lohr) argued in its motion for summary judgment Block could not prove Lohr's alleged malpractice caused these damages because there was no evidence that, had Lohr advised Block to obtain permission from QED to enter into these deals, QED would have given Block such permission. The trial court did not address this argument or grant Raines Feldman's motion for summary judgment on this ground.

To defeat the motions for summary judgment, however, Block did not have to present evidence QED would have given him permission to enter into the deals QED claimed were unauthorized. Block only needed to create a triable issue of

21

material fact regarding whether he would not have committed QED to such deals had Lohr told him to seek QED's prior authorization, or at least advised him authorization was an issue. And Block did just that. Block stated in his declaration he believed he had authority "to proceed with projects in which [he] was involved at [the time he began negotiating his separation from QED], including projects on which [he] had worked at QED," such as *Dirty Grandpa* and others. Block stated Lohr knew, "as she claimed to be counsel to [QED], that [QED] took the position that [he] did not have authority to work on or finance these projects elsewhere without [QED's] consent." And Lohr's email to Shapiro in December 2014 suggesting QED narrow the release in the long-form agreement shows that Lohr discussed the scope of Block's authorization with QED. In addition, Block submitted evidence showing Lohr continued to "counsel[ ] and assist[ ]" Block on matters related to *Dirty Grandpa* (and other projects) that could have "expos[ed] him to liability to QED" and "resulted in [QED] suing Block."

Meanwhile, QED sued Block for working on those very projects and deals. QED's March 2015 arbitration demand alleged Block entered into certain agreements without QED's authorization, including deals relating to *Dirty Grandpa*. And the November 2015 settlement agreement reduced Block's share of the back-end fee from *Dirty Grandpa*, required Block to transfer to QED certain assets and rights related to *Dirty Grandpa*, and required Block to pay QED $1.5 million. To the extent these liabilities (and attorneys' fees resulting from the arbitration and settlement) were attributable to deals Lohr negotiated or documented on Block's behalf after December 2014, a trier of fact could conclude Lohr's alleged malpractice caused Block's damages. (See *Viner v. Sweet, supra*, 30 Cal.4th at p. 1241.)

22

To sum up, Block has one claim remaining that he has not abandoned or that is not speculative as a matter of law: Lohr through Raines Feldman breached her duties to Block in representing him in transactions with third parties after December 2014 that increased his potential liability to QED and caused him to incur attorneys' fees. We now consider whether Raines Feldman and Lohr are entitled to summary judgment on that claim on the other grounds raised by the motion: Whether the claim is barred by the statute of limitations or because Raines Feldman and Lohr cannot defend themselves against the claim without revealing attorney-client privileged communications.

C. *Block Created Triable Issues of Material Fact Regarding Whether the Defendants' Continuing Representation Tolled the Statute of Limitations*

What remains of Block's causes of action for breach of fiduciary duty, negligence, and breach of oral contract is the claim based on Raines Feldman's and Lohr's representation of Block after December 2014 in connection with deals that QED claimed were unauthorized. Counsel for Block stated at oral argument that Lohr's actionable conduct (through Raines Feldman) occurred as early as January and February 2015. Because QED's March 2015 arbitration demand alleged that QED did not authorize certain agreements Block entered into on QED's behalf and demanded Block pay QED monetary damages, Block discovered at that time, or through the use of reasonable diligence should have discovered, the facts constituting Lohr's alleged wrongful conduct. Thus, Block had one year under section 340.6, subdivision (a), or until March 2016, to sue to recover damages caused by the wrongful acts Block alleges Lohr committed in early 2015. Because Block did not file this action

23

until May 2016, his claim for those damages is barred unless the statute of limitations is tolled.

Block argues that Raines Feldman's and Lohr's continued representation of him on related matters tolled the statute of limitations under section 340.6, subdivision (a)(2). Block submitted sufficient evidence to create triable issues of material fact on this issue.

### 1. *Applicable Law*

Section 340.6, subdivision (a), provides the statute of limitations for actions arising from legal malpractice. (See *Nguyen v. Ford* (2020) 49 Cal.App.5th 1, 11-12, 17 (*Nguyen*) [section 340.6, subdivision (a), applies to any causes of action that depend "'on proof that an attorney violated a professional obligation' . . . notwithstanding how they are styled"]; *Bergstein v. Stroock & Stroock & Lavan LLP* (2015) 236 Cal.App.4th 793, 819 ["'[w]hen determining which statute of limitations applies to a particular action, a court considers what the principal purpose or "gravamen" of the action is, rather than the form of action or the relief demanded"].) Legal malpractice causes of action are timely if "commenced within one year after the plaintiff discovers, or through the use of reasonable diligence should have discovered, the facts constituting the wrongful act or omission . . . ." (§ 340.6, subd. (a).)

Section 340.6, subdivision (a)(2), tolls the statute of limitations "during the time that . . . [¶] [t]he attorney continues to represent the plaintiff regarding the specific subject matter in which the alleged wrongful act or omission occurred." The purpose of this provision is "'to "avoid the disruption of an attorney-client relationship by a lawsuit while enabling the attorney to correct or minimize an apparent error, and to prevent

24

an attorney from defeating a malpractice cause of action by continuing to represent the client until the statutory period has expired.""" (*Nielsen v. Beck* (2007) 157 Cal.App.4th 1041, 1048 (*Nielsen*); accord, *Beal Bank, SSB v. Arter & Hadden, LLP* (2007) 42 Cal.4th 503, 511.)

"Section 340.6(a)(2) does not provide a standard for determining when an attorney's representation in a 'specific subject matter' terminates, thus ending the tolling period." (*Nguyen, supra*, 49 Cal.App.5th at p. 12; see *Nielsen, supra*, 157 Cal.App.4th at pp. 1048-1049 [neither section 340.6 nor its legislative history states a standard to determine when an attorney's representation of a client regarding a specific subject matter continues or when the representation ends].) "In the absence of specific statutory guidance, courts have developed a number of principles to direct the inquiry." (*Nguyen*, at p. 12.) In general courts consider whether an attorney defendant continued to represent the plaintiff after the plaintiff discovered the alleged malpractice, and if so, whether the continued representation encompassed the specific subject matter giving rise to the alleged malpractice. (See *Nielsen*, at pp. 1052-1053.) Whether an attorney continued to represent the plaintiff regarding the specific subject matter is generally a question of fact, but the court can decide the issue as a matter of law if the undisputed facts support only one conclusion. (*Nguyen,* at p. 14; *Gonzalez v. Kalu* (2006) 140 Cal.App.4th 21, 31.)

### 2. *Block Submitted Evidence Creating Triable Issues of Fact Regarding Whether Raines Feldman and Lohr Continued To Represent Him*

Block contends there were triable issues of fact regarding whether Lohr, through Raines Feldman, continued to represent him after March 2015. "'"An attorney's representation of a client ordinarily ends when the client discharges the attorney or consents to a withdrawal, the court consents to the attorney's withdrawal, or upon completion of the tasks for which the client retained the attorney."'" (*Nguyen, supra*, 49 Cal.App.5th at p. 13; see *GoTek Energy, Inc. v. SoCal IP Law Group, LLP* (2016) 3 Cal.App.5th 1240, 1246; *Nielsen, supra*, 157 Cal.App.4th at p. 1049.) "[T]he inquiry into when representation has terminated does not focus on the client's subjective beliefs about whether the attorney continues to represent him or her in the matter. Instead, the test is objective and focuses on the client's reasonable expectations in light of the particular facts of the attorney-client relationship. 'In deciding whether an attorney continues to represent a client, we do not focus "'on the client's subjective beliefs'"; instead, we objectively examine "'evidence of an ongoing *mutual* relationship and of activities in furtherance of the relationship."'" (*Nguyen*, at p. 14; see *GoTek Energy,* at p. 1248; *Shaoxing City Maolong Wuzhong Down Products, Ltd. v. Keehn & Associates, APC* (2015) 238 Cal.App.4th 1031, 1038 (*Shaoxing City*).) "Representation ends "'when the client actually has or reasonably should have no expectation that the attorney will provide further legal services."'" (*Nguyen*, at p. 14.) "In other words, tolling under the continuous representation exception ends when "'a client has no *reasonable* expectation that the attorney will provide further legal services."'" (*Ibid*.)

26

Continuing representation can toll the limitations period even though the client is aware of the attorney's negligence and consults another attorney. (*Nielsen, supra*, 157 Cal.App.4th at p. 1049; *O'Neill v. Tichy* (1993) 19 Cal.App.4th 114, 120-121.) For example, "evidence that an attorney continued to bill a client for work related to the matter defeated summary judgment over the application of section 340.6(a)(2), notwithstanding evidence that another attorney had taken over the representation." (*Nguyen, supra*, 49 Cal.App.5th at p. 14; see *O'Neill*, at p. 121.) "Conversely, a Court of Appeal found as a matter of law that the continuous tolling exception did not apply where the attorney had substituted out as counsel and it was 'undisputed' that the attorney did not provide legal advice, perform work, send bills, or appear on behalf of the plaintiff after the attorney substitution." (*Nguyen*, at p. 14; see *Shaoxing City, supra*, 238 Cal.App.4th at p. 1039 ["the relationship can continue—notwithstanding the withdrawal and substitution—if the objective evidence shows that the attorney continues to provide legal advice or services"].)

Block contends Lohr, through Raines Feldman, continued to represent him on numerous matters related to the alleged malpractice after March 2015. Block submitted evidence (and the defendants do not appear to deny, at least for purposes of their motions for summary judgment) Lohr continued to provide legal services to him or his companies. To apply the continuous representation exception to Block's action, however, Lohr must have provided those services through Raines Feldman and on behalf of Block personally.[6]

---

[6] If Lohr provided such services through LHR Enterprises and not Raines Feldman, the statute of limitations may be tolled against Lohr and LHR Enterprises, but not Raines Feldman.

Block submitted sufficient evidence to create triable issues of material fact on both questions. Block submitted emails concerning Lohr's work on *Dirty Grandpa* in 2014, in which she copied Mogin, and Mogin joined a "kickoff call" for *Dirty Grandpa* on October 2, 2014. Block stated in his declaration that Lohr confirmed to him that Mogin and other Raines Feldman attorneys were involved in the negotiations relating to *Dirty Grandpa*. The January 12, 2015 conflict waiver letter shows Raines Feldman represented Block in some capacity; otherwise, the firm would not have required Block to waive conflicts created by Raines Feldman's representation of QED. Indeed, Block "as an individual" was a party to the conflict waiver, and Lohr signed the letter "on behalf of" Raines Feldman. The evidence submitted by Block showing Lohr continued to provide him services after March 2015 does not directly refer to Raines Feldman or any other Raines Feldman attorney, but those services involved the same or similar matters as those on which Mogin was previously involved, and Lohr was of counsel at Raines Feldman at the time. Finally, Lohr's objections to Block's subpoena in connection with the arbitration stated that she "acted as the attorney for the parties," which included Block as an individual. Taken together, this evidence created triable issues of material fact regarding whether Lohr and Raines Feldman continued to represent Block after March 2015 and within one year before he filed this action.

3. *Block's Evidence Created Triable Issues of Material Fact Regarding the Scope of Raines Feldman's and Lohr's Representation After March 2015*

Courts have variously described the connection required between the "specific subject matter in which the alleged

28

wrongful act or omission occurred" and the subject matter in which an attorney continues to represent the client for purposes of the continuous representation tolling provision in section 340.6, subdivision (a)(2). Courts generally interpret "specific subject matter" to include "different, but related, actions." (*Jocer Enterprises, Inc. v. Price* (2010) 183 Cal.App.4th 559, 571.) For example, courts have held section 340.6, subdivision (a)(2), tolled the statute of limitations when the continuing matter is "intertwined and related, having overlapping objectives and purposes" (*Nielsen*, *supra*, 157 Cal.App.4th at p. 1054), arose "from the same event" (*ibid.*; see *Gold v. Weissman* (2004) 114 Cal.App.4th 1195, 1200), sought "to protect the interests acquired by the client in the original transaction" (*Crouse v. Brobeck, Phleger & Harrison* (1998) 67 Cal.App.4th 1509, 1530), is affected by the client's position in the original matter (*Lockley v. Law Office of Cantrell, Green, Pekich, Cruz & McCort* (2001) 91 Cal.App.4th 875, 890), or presented "unsettled" matters "tangential" to the original matter (*Kelly v. Orr* (2016) 243 Cal.App.4th 940, 949; see *Lockton v. O'Rourke* (2010) 184 Cal.App.4th 1051, 1063 ["the representation is on the same specific subject matter until the agreed tasks have been completed or events inherent in the representation have occurred"]).

In ruling on the motions for summary judgment, the trial court defined the original matter as "the failed QED separation deal" and ruled there was no evidence linking the services Lohr continued to provide Block to his separation deal. Block's reframed complaint, as described by counsel for Block at oral argument, focuses less on the failed long-form agreement and more on Lohr's allegedly conflicted representation of Block after

29

Block and QED agreed to the terms of the framework. And Block submitted evidence showing that after May 2015, and as late as October 2015, well within the one-year limitations period, Block sought and Lohr gave advice concerning Block's rights in projects including *Dirty Grandpa* and others. For example, Block submitted evidence showing Lohr advised him in connection with a collection account management agreement, distribution deals, and a sales fee for *Dirty Grandpa*. These appear to be the same types of deals that QED alleged in the March 2015 arbitration demand Block had no authorization to enter. Lohr's representation of Block in the distribution and other agreements for *Dirty Grandpa* indicate the later deals were "intertwined and related, having overlapping objectives and purposes" (*Nielsen, supra*, 157 Cal.App.4th at p. 1054), arose "from the same event," namely the production of *Dirty Grandpa* and other projects Block began while still employed by QED (*Gold v. Weissman, supra*, 114 Cal.App.4th at p. 1200), and were incomplete tasks "inherent in the [prior] representation" (*Lockton v. O'Rourke, supra*, 184 Cal.App.4th at p. 1063). Block therefore created a triable issue of fact whether Lohr later represented Block on the same specific subject matter from which Block's allegations of malpractice arose.

D. *The Attorney-client Privilege Does Not Preclude Raines Feldman and Lohr from Defending Themselves in This Action*

Because we conclude that Block's action is not time-barred and that some of his claimed damages are not speculative, we consider whether, as Raines Feldman and Lohr contend, the trial court erred in refusing to dismiss Block's complaint on the ground they could not defend themselves without disclosing attorney-

30

client privileged communications between them and QED. The trial court ruled Raines Feldman and Lohr "failed to clearly show that privileged information is 'highly material' to [their] defenses" and that fundamental fairness dictated dismissal. The court's analysis centered on Raines Feldman and Lohr's argument they had to reveal privileged information, including "communications with QED, the drafts [of the separation agreement] Raines Feldman prepared that were not shared with Block, and Raines Feldman's internal communications about those drafts" to show their actions did not derail the separation agreement.

But again, Block no longer claims Raines Feldman and Lohr are liable for derailing the separation agreement, and neither Raines Feldman nor Lohr argued in the trial court or on appeal they cannot defend against Block's allegations that they "represent[ed] Block notwithstanding a clear conflict of interest emanating from their representation of [QED]" or "negotiat[ed] new deals for Block outside [QED] that [QED] contended were in violation of Block's obligations" to QED without revealing privileged information. Therefore, Raines Feldman and Lohr forfeited that argument. (See *Johnson v. Greenelsh* (2009) 47 Cal.4th 598, 603; *Colyear v. Rolling Hills Community Assn. of Rancho Palos Verdes* (2017) 9 Cal.App.5th 119, 137, fn. 5.) And even if not forfeited, the argument lacks merit.

### 1. *Applicable Law*

The court in *Dietz v. Meisenheimer & Herron* (2009) 177 Cal.App.4th 771 (*Dietz*) identified four factors a court should consider before dismissing a case on the ground that "a defendant attorney's due process right to present a defense would be violated by the defendant's inability to disclose a client's confidential information if the action were allowed to proceed."

31

(*Id.* at p. 792; see *Reilly v. Greenwald & Hoffman, LLP* (2011) 196 Cal.App.4th 891, 904.)  "First, the evidence at issue must be the client's confidential information, and the client must be insisting that the information remain confidential."  (*Dietz*, at p. 792.)  Second, the confidential information at issue must be "highly material" to the defendant's defenses.  (*Ibid*.)  Third, "before dismissing a case on due process grounds, the trial court must determine whether it is able to effectively use 'ad hoc measures from [its] equitable arsenal,' including techniques such as 'sealing and protective orders, limited admissibility of evidence, orders restricting the use of testimony in successive proceedings, and, where appropriate, in camera proceedings,' so as to permit the action to proceed."  (*Id.* at p. 793, quoting *General Dynamics Corp. v. Superior Court* (1994) 7 Cal.4th 1164, 1191.)  "Finally, a trial court should consider whether it would be 'fundamentally unfair' to allow the action to proceed."  (*Dietz*, at p. 793.)

In general, "a court may take the extraordinary step of dismissing a plaintiff's claim on the ground that an attorney defendant's due process right to present a defense is compromised by the defendant's inability to present confidential information in support of that defense only in the rarest of cases, after the court has considered all of the factors discussed above."  (*Dietz*, *supra*, 177 Cal.App.4th at p. 794.)  Dismissing an action "whenever a lawyer's ethical duties prevented the lawyer from presenting evidence having *any* relevance to the action, without respect to the materiality of the evidence" would render "the 'drastic action' of dismissal" commonplace.  (*Id.* at p. 792; see *People ex rel. Herrera v. Stender* (2012) 212 Cal.App.4th 614, 646.)

2.   *The* Dietz *Factors Do Not Support Dismissal*

We assume for purposes of this appeal that QED supplied confidential information relevant to Raines Feldman's and Lohr's defense and that QED has not waived the attorney-client privilege to allow Raines Feldman or Lohr to disclose it.[7]  With regard to the second *Dietz* factor, Block's remaining claim does not for the most part depend on QED's communications with Raines Feldman or Lohr.  The evidence relating to this claim primarily involves communications between and among Block, Lohr, and the third parties with whom Lohr communicated on Block's behalf, with the exception of evidence reflecting Lohr's knowledge that QED disapproved of certain deals Block pursued. As discussed, however, Block submitted in opposition to the motion for summary judgment an email showing Lohr likely had knowledge of the scope of Block's authority to enter into deals concerning projects he began while employed by QED.  Thus, any other privileged communications relevant to Raines Feldman's and Lohr's defense are not "highly material" under *Dietz*.  (See *Dietz, supra*, 177 Cal.App.4th at p. 795 ["merely because some evidence that might be beneficial to the defendant is protected by a privilege and is therefore not subject to discovery and/or may not be introduced in evidence" is not sufficient to dismiss an entire action]; *id.* at p. 794 [rejecting the argument that due process required dismissal if the defendant is "prevented . . . from

---

[7]   Block disputes whether QED instructed Raines Feldman to maintain the confidentiality of QED's communications with Raines Feldman and Lohr.

33

presenting '*any* of the relevant evidence that may bolster the defense'"].)[8]

The trial court did not make a specific finding on the third *Dietz* factor: the availability of ad hoc measures, such as privilege logs and protective orders, to permit the action to proceed. (See *Dietz, supra*, 177 Cal.App.4th at p. 793.) But the trial court suggested Raines Feldman and Lohr could have shown privileged information was "highly material" to their defense (the second *Dietz* factor) without exposing any such information "via a privilege log or other means, but [they] failed to do so." Raines Feldman and Lohr argue the trial court erred because they submitted a privilege log in connection with a motion to compel

---

[8] Raines Feldman and Lohr argue *Solin v. O'Melveny & Myers* (2001) 89 Cal.App.4th 451 requires dismissal if any evidence relevant to their defense strategy is privileged. Unlike the information in this case or in *Dietz*, the clients' information in *Solin* was critical to the defense because the information was the basis for the defendant's allegedly negligent advice. (*Solin*, at p. 463; see *id*. at pp. 460-461 [the content of the privileged communication was "'likely to prove outcome determinative before a jury'"].) Because "the central disputed issues" in *Solin* were "'incapable of complete resolution without breaching the attorney-client privilege,'" due process required dismissal. (See *id*. at pp. 466-467.) The same cannot be said of Block's allegation that Lohr's conflicted representation increased his liability to QED, which is based on Lohr's negotiations and communications with third parties, not communications with QED. (See *Dietz, supra*, 177 Cal.App.4th at pp. 792-793 [distinguishing *Solin* and holding the defendants' privileged information was not highly material because they could "present 'a[ ] meaningful defense'" without "disclos[ing] privileged or confidential information"]; see also *Reilly v. Greenwald & Hoffman, LLP*, *supra*, 196 Cal.App.4th at p. 904.)

Block filed in discovery. Raines Feldman and Lohr, however, made no mention of the privilege log in their motions for summary judgment. Instead, Raines Feldman and Lohr argued only that Block's suggestion the defendants seek "a sealing order allowing the privileged communications to be used" is barred by California law. Raines Feldman and Lohr, however, had the burden to show that sealing and protective orders, in camera proceedings, or other procedural mechanisms would not have been enough to allow the action to proceed. (See *General Dynamics Corp. v. Superior Court, supra,* 7 Cal.4th at p. 1191; *Dietz*, at p. 793.) They did not meet their burden.

Finally, fundamental fairness weighs against dismissal. "Fundamental fairness in this context is an extension of the principle that, '[t]he privilege which protects attorney-client communications may not be used both as a sword and a shield.'" (*Dietz, supra*, 177 Cal.App.4th at p. 793.) The court in *Dietz* "noted the inherent unfairness in allowing a plaintiff to bring a claim, which, by its very nature necessitates a defense based on confidential information, where the plaintiff has either directly supplied such confidential information to the defendant, as in *Solin* [*v. O'Melveny & Myers* (2001) 89 Cal.App.4th 451], or where the plaintiff seeks to derivatively represent a third party who has supplied such information to the defendant, as in" *McDermott, Will & Emery v. Superior Court* (2000) 83 Cal.App.4th 378. (*Dietz*, at p. 793; see *Solin*, at p. 463; see also *McDermott*, at p. 384.) Like the plaintiff in *Dietz*, Block did not supply any confidential information relevant to Raines Feldman's and Lohr's defense to Block's remaining claim. (See *Dietz*, at p. 797 [the "plaintiff in this case did not participate in the sharing of confidential information with the defendant attorney"].) Because Block's action "does not involve the affirmative use of the confidential information" (*ibid.*), notions of fundamental fairness

do not dictate dismissal of Block's action.  This is not one of the rare cases where dismissal is appropriate.

> E.   *The Trial Court Should Allow Block To Refile His Motion for Leave To Amend*

>> 1.   *Relevant Proceedings*

Block filed a motion for leave to amend his complaint on February 11, 2019, over two years after he filed his original complaint and two months after Raines Feldman and Lohr filed their motions for summary judgment.  Block based his motion on what he characterized as newly discovered information from Lohr's January 2019 deposition in which, according to Block, she testified she made knowingly false statements in the January 15, 2015 conflict waiver letter.  In particular, Block stated he learned in the deposition Lohr falsely stated in the conflict waiver letter she represented Block individually in matters related to the separation agreement between Block and QED.  Block argued that he relied to his detriment on Lohr's false representations and that, had Lohr been truthful, he would not have signed the conflict waiver letter and would not have consented to Raines Feldman's representation of QED.  Based on this evidence, Block proposed to add, among other things, a cause of action for intentional misrepresentation.

Raines Feldman and Lohr opposed Block's motion, arguing Block had known since filing the original complaint Lohr had taken the position she never represented Block personally.[9]

---

[9]   Raines Feldman and Lohr also argued the proposed first amended complaint was a sham pleading and failed to allege facts constituting a cause of action because Block could not establish a causal relationship between the alleged

36

Raines Feldman and Lohr cited Block's allegation in the original complaint that Lohr "took the outrageous and patently false position that she had never represented Block," an October 2015 email from counsel for Lohr stating Lohr had never represented Block personally, and Lohr's verified written discovery responses from March 2017 that stated: "Lohr has never represented [Block] personally, whether through LHR Enterprises, Raines Feldman, or otherwise. She has never had a written engagement agreement with [Block] to represent him personally, in connection with his separation from [QED] or otherwise. She has never billed [Block], personally, for any services in connection with the separation or otherwise." Raines Feldman and Lohr argued that "Block's delay in seeking leave to amend is reason alone to deny his motion" and that Block's delay prejudiced them because he filed his motion in response to their motions for summary judgment.

In reply, Block drew a distinction between knowing that Lohr had previously taken the position she did not represent Block personally and learning that Lohr knowingly made false statements in the conflict waiver letter to induce him to sign it. Block stated he believed Lohr previously claimed she did not represent Block to get out of having to testify at the arbitration, but he did not realize until her deposition in January 2019 she used false statements to induce Block to sign the conflict waiver

---

misrepresentation and his damages. Because the trial court agreed with Raines Feldman and Lohr's argument that Block's delay in filing his motion until after they had filed their motions for summary judgment was prejudicial, the trial court did not consider, and no party reasserts, these other reasons for denying Block's motion for leave to amend.

letter, presumably to allow her and Raines Feldman to represent a more lucrative client, QED.

The trial court denied the motion, finding that Block "discovered nothing new regarding the truthfulness of Ms. Lohr's conflict letter representations" and that Block could have included the proposed new causes of action in the original complaint. The court concluded Block's "delay in presenting these amendments are unwarranted and prejudicial to defendants in light of the pending summary judgment motions."

### 2. *Applicable Law*

"'[S]ection 473, subdivision (a)(1) permits a court, "in furtherance of justice," to "allow a party to amend any pleading . . . in any . . . respect."'" (*Duchrow v. Forrest* (2013) 215 Cal.App.4th 1359, 1377.) ""Courts must apply a policy of liberality in permitting amendments at any stage of the proceeding, including during trial, when no prejudice to the opposing party is shown."'" (*Eng v. Brown* (2018) 21 Cal.App.5th 675, 706; see *Duchrow*, at p. 1377.)

"'Generally, "the trial court has wide discretion in determining whether to allow the amendment, but the appropriate exercise of that discretion requires the trial court to consider a number of factors: 'including the conduct of the moving party and the belated presentation of the amendment. [Citation.] . . . . The law is well settled that a long deferred presentation of the proposed amendment without a showing of excuse for the delay is itself a significant factor to uphold the trial court's denial of the amendment.'"'" (*Eng v. Brown, supra*, 21 Cal.App.5th at pp. 706-707.) """The law is also clear that even if a good amendment is proposed in proper form, unwarranted delay in presenting it may—of itself—be a valid reason for denial."'"" (*Id.*

38

at p. 707; see *Duchrow v. Forrest, supra,* 215 Cal.App.4th at
p. 1377; *Fair v. Bakhtiari* (2011) 195 Cal.App.4th 1135, 1147.)
"On the other hand, where there is no prejudice to the adverse
party, it may be an abuse of discretion to deny leave to amend."
(*Fair*, at p. 1147.) The appellant has the burden of establishing
an abuse of discretion. (*Eng,* at p. 707.)

> ### 3. *On Remand Block Should Have an Opportunity To Ask for Leave To Amend His Complaint*

Block argues the trial court abused its discretion in denying
his motion for leave to amend the complaint because the court
based its ruling on the erroneous finding that Block discovered
nothing material during Lohr's January 2019 deposition. Block
argues it was not until Lohr's deposition that he learned Lohr
knowingly made false statements in the conflict waiver letter by
stating she represented Block personally. Block contends his
earlier knowledge Lohr denied ever personally representing
Block was not sufficient to state a cause of action for intentional
misrepresentation. Thus, Block argues, he did not delay in
seeking leave to amend the complaint.

Even if Lohr's deposition testimony was not a critical
(missing) element of Block's proposed cause of action for
intentional misrepresentation, our reversal of the judgment
affects the ruling on Block's motion for leave to amend. The trial
court denied the motion for two reasons: (1) Block waited too
long to file his motion for leave to amend and (2) Block filed his
motion after the defendants filed their motions for summary
judgment, which prejudiced the defendants. On the latter issue,
the trial court cited *Melican v. Regents of University of
California* (2007) 151 Cal.App.4th 168, where the court affirmed
the denial of an oral request to amend the complaint during the

39

hearing on a motion for summary judgment. (*Id.* at p. 177.) The court in *Melican* stated: "It would be patently unfair to allow plaintiffs to defeat [the defendant's] summary judgment motion by allowing them to present a 'moving target' unbounded by the pleadings." (*Id.* at p. 176.)

Because the motions for summary judgment are no longer pending, however, the basis for the trial court's finding of prejudice no longer exists. There is only the delay in seeking leave to amend, which may or may not be sufficient to justify denial of the motion. It is unclear from the record, which indicates the trial court relied equally on the fact the motions for summary judgment were pending and on Block's delay in seeking leave to amend, whether the court would have denied Block's motion if the court had denied the motions for summary judgment. Therefore, on remand, the trial court should allow Block, if he chooses, to refile his motion for leave to amend his complaint.

## DISPOSITION

The judgment is reversed.  The orders granting the motions for summary judgment and denying the motion for leave to amend are vacated.  The trial court is directed to enter new orders denying the motions for summary judgment and to allow Block to refile his motion for leave to amend.  The parties are to bear their costs on appeal.


SEGAL, Acting P. J.



We concur:



FEUER, J.



DILLON, J.*

---

\*      Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.